Rockingham,
Nov. 4, 1936.

## STATE *v.* JAMES HARMON.

*Thomas P. Cheney*, Attorney-General, and *Dudley W. Orr*, Assistant Attorney-General (*Mr. Orr* orally), for the State.

*Batchelder & Wheeler* (*Mr. Wheeler* orally), for the defendant.

MARBLE, J. The State's evidence tended to prove the following facts:

The defendant had been living at his father's home in Portsmouth for more than two years previous to August 1, 1934, the date of the alleged crime. His mother died on July 10, 1934. After her death the defendant and his father continued to reside in the old home. For some time persons in the vicinity had been disturbed by noises which indicated that the respondent was illtreating his father. Early in the afternoon on the first day of August, two women heard John Harmon uttering such cries as "Help! Murder!" "You are killing me." One of these women consulted her next-door neighbor, stating that the defendant was "at him again," and this neighbor decided to call the police.

When the officers arrived they found John Harmon sitting in a chair, his face bruised and bloody. He was in a "beaten up condition" and was "nearly spent." The defendant was standing in the middle of the floor "perspiring freely."

One of the officers described the situation as follows: "I found Mr. Harmon sitting in a chair in the corner of the kitchen . . . and James Harmon was standing . . . right near the center of the kitchen. James Harmon was excited and exhausted and so was John Harmon. I tried to talk to Mr. John Harmon but it was kind of hard to understand him. He had an abrasion on the bridge of his nose that was bleeding. There was cuts on both arms and the side of his left cheek, and he had a pool of blood in his mouth and it dripped down from his lip. I tried to have Mr. Harmon tell me what the trouble was, and he put his hand, his left hand to his right arm, and pointing over to James Harmon, said that he punched him, and he puts his hand up to his head and said that he punched him there. I went over and asked James what was the trouble. He said the old man was crazy, and there was blood on the left sleeve of his shirt and along the pocket of his shirt. I asked him how the blood spots got there and he couldn't answer me. He didn't know, so he said."

The city marshal was present and talked with John Harmon. At the police station the marshal informed the respondent that his father had told him that "James went in a rage and beat him up" because he was unwilling to sign certain papers. The defendant's only comment was that "the old man was crazy." When he came to testify, however, he admitted that his father attempted that after-

noon to sign a "paper" relating to the appointment of the defendant as administrator of his mother's estate, that his father spoiled the paper, and that he (the defendant) "was provoked" at what his father had done and involuntarily placed his hand on his father's shoulder, "shook him and told him to look and see what he was doing"; that his father then "started hollering 'Murder,' " and that he (the defendant) put his hand over his father's mouth "so as to stop his hollering."

Shortly after the alleged assault John Harmon was taken to the hospital where he died three days later. After the funeral the city marshal found the respondent's shirt soaking in a tub of water in the cellar of the Harmon house. The chemist for the state board of health testified that the stains on the shirt were made by blood.

An autopsy performed by the State on the body of John Harmon disclosed a fracture of the outer table of the skull, in the occipital bone, and a blood clot in both the back and frontal region of the brain. The inner table of the skull was not fractured. There was testimony to the effect that if a blow "is extensive, it usually injures both tables." The examination showed Paget's disease, and the skull was "very soft." The pathologist for the state board of health testified that it "would take very little force to fracture" the outer table of "that particular skull." The medical referee testified that a blow on the front of the head could cause a fracture and concussion in the back part of the skull.

Nothing beyond the bare recital of these facts is needed to refute the respondent's contention that the evidence is insufficient to warrant a finding "that death resulted from the act of the defendant and was not caused by accidental or natural causes." The motion to dismiss the indictment was properly denied.

The respondent, on cross-examination, was asked the following question: "Now previous to your taking out administration on your mother's estate, didn't you have some dealings with your father relative to his shifting his life insurance over to you as beneficiary?" He answered without objection: "Father had life insurance and mother was the beneficiary. Mother had passed away, and then it was changed to me." He then answered numerous questions concerning his correspondence with the insurance company, to none of which was any objection made. The solicitor then asked if this insurance was "shifted over" to his name before the "administration paper" was procured. Defendant's counsel objected and excepted to the question on the ground that motive is "no part of a charge of

manslaughter." It is now argued that this "was an attempt by the solicitor to introduce evidence of malice" and that the element of malice is not involved in a charge of manslaughter.

It is unnecessary to consider the defendant's contention. The particular question objected to was not answered but when put in slightly different form, the respondent replied: "Why, I don't know. I haven't any idea." The answer was harmless. *Goddard* v. *Company*, 82 N. H. 225, 230. The respondent then stated again that he became beneficiary of the policy after his mother's death. Since this was merely the restatement of a fact already in evidence without objection, no prejudice could have resulted from its admission. 64 C. J. 171, and cases cited. Moreover no specific objection to the question which elicited this repetition appears to have been made.

*Exceptions overruled.*

All concurred.